**CHARTER FEDERAL SAVINGS AND LOAN ASSOCIATION, WEST POINT, GEORGIA, Petitioner,**

v.

**OFFICE OF THRIFT SUPERVISION,\* Director John W. Johnson, Jr., John W. Johnson, III, Martha B. Jones, Joe H. Wooley, Bobby L. Williams, William C. Gladden, William B. Hudson, Terrell E. Bishop, Floyd H. Mann, Jane W. Darden, Richard T. Taunton, Curti M. Johnson and Robert Lee Johnson, Respondents.**

No. 89–8725.

United States Court of Appeals, Eleventh Circuit.

Oct. 2, 1990.

\* Formerly known as FHLBB.

Lester M. Bridgeman, Miller, Hamilton, Snider & Odom, Mobile, Ala., for petitioner.

Aaron B. Kahn, Office of the Chief Counsel, Office of Thrift Supervision, Washington, D.C., for respondents.

** Honorable Edward D. Re, Chief Judge of the U.S. Court of International Trade, sitting by designation.

Before EDMONDSON and BIRCH, Circuit Judges, and RE **, Chief Judge.

BIRCH, Circuit Judge:

On December 28, 1988, Charter Federal Savings and Loan Association filed with the Federal Home Loan Bank Board an application for permission to convert from the mutual form of organization to the stock form, pursuant to the Federal Home Loan Bank Board's voluntary conversion regulations. The Federal Home Loan Bank Board denied this application based on its findings that: 1) upon liquidation Charter Federal Savings and Loan Association would have a net realizable equity, and 2) the conversion would not be in the best interests of the association, its members, or the federal savings and loan system. Charter Federal Savings and Loan Association requests that we review this decision. For the reasons set out below, we AFFIRM the Federal Home Loan Bank Board's decision to deny the conversion application of Charter Federal Savings and Loan Association.

## I. THE CONVERSION PROCESS

### A. *Background*

There are two basic types of savings and loan associations: mutual associations and stock associations. Either type may be federally chartered or state chartered.[1] A mutual savings and loan association is "owned" by its depositors and borrowers, who elect the association's board of directors. Traditionally a borrower is entitled to one vote, while the voting power of a depositor is determined by the amount deposited in his account, usually one vote for every $100 deposited. Many depositors and borrowers, however, have no interest in voting on the association's policies and practices. Therefore, when first depositing or borrowing money, many association

1. Because this case is concerned with federally chartered savings and loan associations, state chartered associations will not be discussed.

members will sign revocable proxies, authorizing the association's management to cast their votes as it sees fit. The stock association, on the other hand, is like any other corporation—its ownership and control are in the hands of those who have purchased its stock. Ownership of the association's stock is not a prerequisite for doing business with the association; its stockholders are not necessarily its depositors and borrowers.

Many mutual associations choose to convert to stock associations in order to increase their capital through stock offerings. Accordingly, a detailed set of rules and regulations concerning the conversion process has been developed. In 1933, Congress enacted the Home Owners' Loan Act (HOLA),[2] which created the federally chartered mutual savings and loan association. Originally, HOLA did not allow for the conversion of federally chartered mutual associations to stock associations. However, in 1948, Congress added section 5(i) to HOLA, allowing federal mutual savings and loan associations to convert to state stock associations.

The early conversion process began to weaken the Federal Home Loan Bank System. The system itself suffered because many federally chartered associations converted to state chartered associations. The

depositors suffered because many conversion insiders reaped windfall profits, depleting the worth of many associations, and leading to disproportionate ownership and control by the insiders. The Federal Home Loan Bank Board (the Bank Board)[3] reacted by declaring a moratorium on federal to state conversions.

In 1973, Congress began to lift the moratorium. Congress amended HOLA by adding section 402(j), which gave the Bank Board the power to approve conversions of federally chartered mutual associations to federally chartered stock associations. The moratorium, however, was not lifted completely until 1976, giving the Bank Board an opportunity to develop and clarify the conversion regulations. These regulations continue to evolve.[4]

By 1989, Congress had made clear that federally chartered mutual associations were free to convert to federally chartered stock associations, but only if the conversion complied with the rules promulgated by the Bank Board.[5] These rules are contained in the regulations of the Bank Board. Through its regulations, the Bank Board attempts to ensure that conversions will benefit the converting association, its members, and the general public.[6]

The Bank Board has allowed three basic types of conversions.[7] In a standard con-

---

2. 12 U.S.C. § 1461, *et seq.*

3. The Bank Board "adopts the policies and regulations that guide the Federal Home Loan Bank System, that promote efficiency in its operation, and that ensure the safety and soundness of the nation's thrift institutions." Federal Home Loan Bank Board, *A Guide to the Federal Home Loan Bank System* 25 (5th ed. 1987).

4. The statutes and regulations relevant to this case and, therefore, the ones that will be discussed, are those that were in existence in 1989, the year in which most of the events discussed in this opinion took place. The Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub. L. No. 101–73, 103 Stat. 183 (Aug. 9, 1989) which has replaced these provisions and regulations will not be discussed.

5. In relevant part, the 1989 version of title 12 of the United States Code stated:
   Section 1464. Thrift Institutions

   .    .    .    .    .

   (i) Conversions to Federal charters

(2) Subject to the rules and regulations of the Board, any Federal association may convert itself from the mutual form to the stock form . . .
Section 1725. Creation of Federal Savings and Loan Insurance Corporation

.    .    .    .    .

(j) Conversion from mutual to stock form of organization
   (1) Except as provided in section 1464 of this title, no insured institution may convert from the mutual to the stock form except in accordance with the rules and regulations of the [Federal Savings and Loan Insurance] Corporation.

6. 12 C.F.R. § 563b.3(c)(21) (1989). *See* 12 C.F.R. § 563b.1 (1989).

7. *See generally* 12 C.F.R. § 563b (1989). The details of the three conversion processes will be further discussed *infra.*

version, a federal mutual association may convert to a federal stock association if a majority of the account-holders approve the plan of conversion already approved by two-thirds of the association's board of directors. The stock of the association must be sold at a price equal to the association's estimated market value, as determined by an independent appraiser. Voluntary and modified conversions are appropriate when the association is experiencing financial difficulty. In order for a voluntary conversion to be approved by the Bank Board, the association must be insolvent. Because the conversion of an insolvent mutual association is necessary to infuse capital into the association, the voting rights of the association's account-holders regarding the conversion decision are eliminated. A modified conversion is best when an association is not meeting its regulatory capital requirements. As in a voluntary conversion, the members of the association have no say in the decision to undergo a modified conversion because the financial needs of the association leave no room for choice in the matter. The stock created in a modified conversion must be sold for an amount greater than the association's market value; the acquirer is paying for the privilege of control. No conversion may take place without prior approval from the Bank Board.[8]

## B. *The Types of Conversion*

### 1. Standard Conversions

The Bank Board's regulations offer guidance to mutual associations interested in converting to stock associations. The regulations describe the characteristics of a Bank Board-approved conversion, including the roles of the association's board of directors and members, the method of sale of the converted institution's stock, and the procedure to be followed throughout the conversion process. The standard conversion, as is apparent from its name, is the most common. Many of the standard conversion regulations also apply to voluntary and modified conversions.[9]

A standard conversion requires action by the association's board of directors as well as its members. The association's plan of conversion must be approved by at least two-thirds of the association's board of directors.[10] If approved, the association's members vote on the plan, which must be accepted by "at least a majority of the total outstanding votes of the association members."[11] The Bank Board sets forth specific notice, proxy, and voting rules to ensure that the approval or disapproval of the association's members is fairly obtained.[12]

The Bank Board also prescribes regulations concerning the sale of the converting association's stock. Each officer, director and account holder eligible to purchase stock in the converted association, plus each association voting member, must receive a certain number of subscription rights to purchase the association's stock.[13] The regulations restrict the amount of stock that may be purchased by one person or group of persons acting together, including the converting association's officers and directors.[14]

The standard conversion regulations also dictate the price at which the converted association's stock must be sold. The total stock price must equal the association's pro

---

8. 12 C.F.R. § 563b.1(a) (1989).

9. 12 C.F.R. § 563b.3(a) (1989) ("The provisions of this subpart shall govern conversions undertaken pursuant to any other subpart of this part unless clearly inapplicable."). The regulations concerning standard conversions are located in 12 C.F.R. §§ 563b.1–.10 (1989). Those concerning voluntary conversions are found in 12 C.F.R. §§ 563b.20–.32 (1989), and those concerning modified conversions are located in 12 C.F.R. §§ 563b.34–.41 (1989).

Because the conversion application requirements, as discussed *infra*, are numerous and can appear complicated, the Bank Board has provided a conversion application form for mutual associations interested in converting to stock associations. *See* 12 C.F.R. § 563b.100 (1989).

10. 12 C.F.R. § 563b.4(a)(3) (1989).

11. 12 C.F.R. § 563b.6(e) (1989).

12. 12 C.F.R. §§ 563b.4–.6 (1989).

13. 12 C.F.R. § 563b.3(c)(2)–(6) (1989).

14. 12 C.F.R. § 563b.3(c)(7)–(9) (1989).

forma market value, based on an independent appraisal.[15] The price per share, which must be uniform, should be between $5.00 and $50.00, and account holders should be permitted to draw from their accounts without penalty in order to pay this price.[16] The association may not lend money to any person or group of persons to purchase its stock.[17] Finally, the Bank Board's regulations provide that the sale of the converting association's stock should be conducted as quickly as possible and must be completed within 45 days.[18] Once the sale is complete, the Bank Board regulations limit repurchases of stock and payments of dividends by the converted association, and limit the ability of the association's officers and directors to resell their stock.[19]

The Bank Board regulations specify the procedural requirements of the conversion application process. For example, the conversion must be completed within a certain amount of time,[20] the costs incurred by the converting association must be reasonable,[21] and the conversion plan must establish a liquidation account.[22] Several rules also discuss the actual filing and preparation of a conversion application.[23]

Finally, the Bank Board has created a "catch-all" requirement: the conversion application may not contain any provision the Bank Board believes to be unfair or harmful to the converting association, its members, or the "public interest." [24] This provision allows the Bank Board to act as a watchdog over the conversion process.

### 2. Voluntary Conversions

Many of the Bank Board's standard conversion regulations apply to voluntary and modified conversions.[25] However, the Bank Board has promulgated separate regulations for voluntary and modified conversions. These regulations explain when the converting association may deviate from the standard conversion rules, and provide substitute rules for the association to follow.[26]

In a voluntary conversion, a majority of the converting association's board of directors must approve the conversion plan.[27] The converting association's members, however, have no right to approve or otherwise participate in the conversion process.[28] Therefore, the Bank Board must ensure that the plan is or would be in the association members' best interest.

Before the Bank Board will consider authorizing a voluntary conversion, two requirements must be met. First, the association's liabilities must exceed its assets according to generally accepted accounting principles (GAAP).[29] In other words, the association must be "GAAP-insolvent." Second, the association must demonstrate that it would be a "viable entity" after the conversion.[30] To create a viable entity, the prospective acquirer of the association must infuse capital into the association sufficient to achieve a required ratio of net worth to total liability.[31] The acquirer

---

**15.** 12 C.F.R. § 563b.3(c)(1) (1989).

**16.** 12 C.F.R. §§ 563b.3(c)(10), 563b.7 (1989).

**17.** 12 C.F.R. § 563b.3(c)(22) (1989).

**18.** 12 C.F.R. § 563b.7(i) (1989).

**19.** 12 C.F.R. §§ 563b.3(c)(17)–(18), 563b.3(g) (1989).

**20.** 12 C.F.R. § 563b.3(c)(11) (1989).

**21.** 12 C.F.R. § 563b.3(c)(20) (1989).

**22.** 12 C.F.R. § 563b.3(f) (1989).

**23.** 12 C.F.R. § 563b.8 (1989).

**24.** 12 C.F.R. § 563b.3(c)(21) (1989).

**25.** 12 C.F.R. § 563b.3(a) (1989).

**26.** 12 C.F.R. §§ 563b.22, 563b.36 (1989). The sections discussing voluntary and modified conversions that follow will focus on these differences and on the special requirements for voluntary and modified conversions. These sections will not highlight the rules common to the different conversions.

**27.** 12 C.F.R. § 563b.21 (1989).

**28.** *Id.*

**29.** 12 C.F.R. § 563b.24(a) (1989).

**30.** 12 C.F.R. § 563b.24(b) (1989).

**31.** 12 C.F.R. § 563b.26(b)(1), (2) (1989).

must also convince the Bank Board that the conversion "transaction taken as a whole is in the best interests of, and does not present the potential for injury to, the converting institution, its depositors and the FSLIC [Federal Savings and Loan Insurance Corporation]." [32]

To obtain authorization for a voluntary conversion, the converting association must file a special application with the Bank Board. The filing of this application must comply with certain procedural requirements.[33] The conversion application itself must comply with numerous substantive requirements. It must contain: a plan of conversion describing the proposed purchasers of the converted association's stock, the sale of the stock, and the type of stock to be sold; opinions of independent attorneys and certified public accountants; a business plan for the converted association; an audited balance sheet and financial statements of the association; and a proposed charter and set of bylaws for the converted association.[34] The application also must include Change–In–Control Act notices for each proposed conversion stock purchaser.[35] If the converting association files a proper conversion application, is GAAP-insolvent, and has shown that it would be a "viable entity" after conversion, the Bank Board may authorize the association's voluntary conversion.[36]

### 3. Modified Conversions

Modified conversions, like voluntary conversions, are available for mutual associations facing financial difficulty, and similarly require the approval of a majority of the association's board of directors, but not the approval of the association's members.[37] A mutual association may qualify for a modified conversion if it is unable to meet its regulatory capital requirement and if a standard conversion feasibly could not remedy this situation.[38]

To obtain Bank Board authorization of a modified conversion, the association must

---

**32.** 12 C.F.R. § 563b.26(b)(3) (1989). The FSLIC guarantees that savings it insures will be available to depositors even if the savings and loan institution in which they are deposited becomes insolvent. *See* Federal Home Loan Bank Board, *A Guide to the Federal Home Loan Bank System*, 47–54 (5th ed. 1987).

**33.** 12 C.F.R. § 563b.28 (1989).

**34.** 12 C.F.R. § 563b.27(a)–(s) (1989).

**35.** 12 C.F.R. § 563b.27(e) (1989). This section states that the Change–In–Control Act notices must comply with 12 C.F.R. § 574.3(b) (1989), which implements the provisions of the Change in Savings and Loan Control Act, 12 U.S.C. § 1730(q) (1989). This Act and its corresponding regulations state that no person shall acquire control of an association unless he or she provides the FSLIC with the written notice required by the Act and the FSLIC does not disapprove the notice.

When determining whether to approve a Change–In–Control Act notice, the FSLIC will examine the background of the proposed conversion stock purchaser and the effect of the proposed change in control. If the FSLIC decides not to approve the notice, it will notify the proposed conversion stock purchaser of this decision within three days. Within 10 days of receipt of notice of disapproval, the proposed acquirer of control may request an agency hearing, after which the FSLIC will approve or disapprove the proposed change in control. If, after the hearing, the FSLIC still disapproves the acquisition of control, the proposed purchaser may seek review of this decision in the United States court of appeals for the circuit in which the main office of the association is located, by filing a notice of appeal in that court within 10 days. The FSLIC's decision may be set aside by the court of appeals only if arbitrary, capricious, or in violation of the provisions of the Change in Savings and Loan Control Act. *See* 12 U.S.C. §§ 1730(j), (q) (1989); 12 C.F.R. § 574 (1989).

**36.** 12 C.F.R. § 563b.24 (1989) ("The [Bank] Board in its discretion may authorize the ... conversion...."). This Bank Board approval, if granted, is not final. It is conditioned upon: completion of the sale of conversion stock within three months (unless the Bank Board for good cause grants an extension); compliance with applicable filing requirements, laws, rules, and regulations; submission of an opinion of independent counsel that all state securities laws have been complied with; and the satisfaction of any other condition the Bank Board decides to impose. 12 C.F.R. § 563b.29 (1989).

**37.** 12 C.F.R. §§ 563b.38(b), .35 (1989).

**38.** 12 C.F.R. § 563b.37 (1989). *See* 12 U.S.C. § 1464(s) (1989) for statutory definition of regulatory capital requirement.

submit a conversion application that complies with the procedural[39] and substantive[40] requirements set forth in the Bank Board's modified conversion regulations. The application must contain: a plan of conversion identifying the proposed purchasers of the conversion stock, the terms of the sale of stock, and the nature of the stock itself; opinions of independent counsel and certified public accountants; a proposed business plan, charter and by-laws for the converted association; all required filings; Change–In–Control Act notices for each proposed conversion stock purchaser[41]; an audited balance sheet and financial statements; an independent appraisal to validate the association's conversion plan; and an estimate of the conversion expenses.

Even after receipt of a complete application, the Bank Board will authorize a modified conversion only if certain other conditions are met. The conversion stock must be sold at an aggregate price greater than the independently appraised, pro forma market value of the association.[42] This price includes a control premium paid by an acquirer of a controlling interest in the association.[43] An independent expert must convince the Bank Board that the capital infused into the association as a result of the modified conversion would enable the association to meet its regulatory capital requirement.[44] Finally, the Bank Board must be certain that the modified conversion would benefit the association, its members and the FSLIC.[45] If all of these prerequisites have been met, the Bank Board may authorize a modified conversion.[46]

## C. *Role of the Bank Board*

The Bank Board is the overseer of the entire Federal Home Loan Bank System,[47] and as such plays an important role in the conversion process. Congress has explicitly stated that no conversion, whether standard, voluntary or modified, may occur unless the converting association complies with the rules and regulations of the Bank Board.[48] No mutual association may convert to the stock form without the Bank Board's consent.[49]

In its role as "watchdog" the Bank Board has promulgated numerous regulations which "reflect an extended effort on the part of the [Bank] Board to develop a conversion procedure that is equitable to account holders and [FSLIC] insured institutions and which functions effectively as a capital-raising tool."[50] Compliance with the Bank Board's substantive and procedural conversion application requirements, however, does not always lead to an equitable result. Therefore, the Bank Board regulations repeatedly refer to the role of the Bank Board's discretion in the conversion process.[51] The Bank Board has the power to deny a conversion application even if it complies with all substantive and procedural requirements, and will do so if the proposed conversion would not be in the best interests of the association, its members, or the general public.[52]

The power of the Bank Board to approve or disapprove a conversion application is not absolute. Congress has provided mutual associations and their members with a procedure to appeal a final decision of the Bank Board.[53] The Bank Board has prom-

---

39. 12 C.F.R. § 563b.41 (1989).

40. 12 C.F.R. § 563b.39 (1989).

41. *See supra* note 35.

42. 12 C.F.R. §§ 563b.35, 563b.38(d) (1989).

43. 12 C.F.R. § 563b.38(d), (g) (1989).

44. 12 C.F.R. § 563b.38(e)(1) (1989).

45. 12 C.F.R. § 563b.38(e)(2) (1989).

46. 12 C.F.R. § 563b.37(a) (1989).

47. *See supra* note 3.

48. *See supra* note 5.

49. 12 C.F.R. § 563b.1(a) (1989).

50. 51 Fed.Reg. 40127, 40131 (1986).

51. *See* 12 C.F.R. §§ 563b.1(a), 563b.3(c)(21), 563b.20(b), 563b.37(a) (1989).

52. 12 C.F.R. § 563b.3(c)(21) (1989).

53. 12 U.S.C. §§ 1725(c)(4), 1730a(k) (1989).

ulgated regulations describing this appellate process in detail.[54]

Once the Bank Board has decided not to approve a mutual association's plan of conversion, a party aggrieved by this decision may file a petition requesting relief in a court of appeals of the United States.[55] The petition must be filed in the court of appeals for the circuit in which the mutual association has its principal place of business or the circuit in which the aggrieved party resides, and must be filed within 30 days of the Bank Board's decision.[56] The clerk of the court receiving the aggrieved party's petition sends a copy to the Bank Board.[57] The Bank Board then returns to the clerk the record of its administrative proceeding.[58] Upon the filing of the administrative record,[59] the court of appeals obtains exclusive jurisdiction over the matter, and has the power to "affirm, modify, terminate, or set aside in whole or in part" the Bank Board's final decision not to authorize the conversion.[60] The judgment entered by the court of appeals is final, unless subject to review by the Supreme Court upon grant of a writ of certiorari.[61]

## II. CHARTER FEDERAL SAVINGS AND LOAN ASSOCIATION

### A. *Background*

Charter Federal Savings and Loan Association (Charter Federal) is a federally chartered mutual savings and loan association. Established in 1954, Charter Federal is headquartered in West Point, Georgia. It has branch offices in La Grange, Georgia and Valley, Alabama, and a loan processing office in Auburn, Alabama.

Like many savings and loan associations, Charter Federal has struggled to maintain its profitability. In 1985, Charter Federal sold its loan portfolio, which consisted of low-yielding, fixed-rate mortgages, at a loss of more than $5 million.[62] This loss greatly reduced Charter Federal's net worth.[63] As of September 30, 1988, Charter Federal had, according to GAAP, a negative net worth of almost $300,000.00.[64] However, Charter Federal was able to meet its regulatory capital requirements.[65]

Charter Federal's most valuable asset is one million shares of preferred stock issued by the Federal Home Loan Mortgage Corporation, commonly referred to as "Freddie Mac" stock.[66] Charter Federal purchased this stock at an average price of approximately $20 per share; in accordance with GAAP, the stock is listed on Charter Federal's books at an asset value of slightly more than $20 million. The market value of this stock, however, is much greater than its cost basis. By December of 1988, Freddie Mac stock was trading at $48 per share. This created an unrealized gain of $28 million for Charter Federal which was not reflected on its balance sheet.[67]

---

54. 12 C.F.R. § 563b.8(u) (1989).

55. *Id.*

56. *Id.* The 30 day period begins to run the day the Bank Board's decision is published in the Federal Register or the day the association mails notice of the proposed plan of conversion to its members, whichever is later. *Id.*

57. *Id.*

58. *Id.*

59. *Id.*

60. *Id.*

61. *Id.*

62. Charter Federal's Application for Conversion, Volume I, Exhibit 8(b), Business Plan at 1.2.

63. *Id.*

64. Conversion Application of Charter Federal, Volume III, Exhibit 8(h), Letter to Bank Board from Charter Federal's counsel dated 12/27/88, at 3.

65. *Id.* Charter Federal's minimum regulatory capital requirement was $4,101,000.00. As of September 30, 1988, Charter Federal's actual regulatory capital was $4,890,534. *Id.*

66. *Id. See* 5 Federal Home Loan Bank Board, *A Guide to the Federal Home Loan Bank System* 55–63 (1987) for an understanding of the Federal Home Loan Mortgage Corporation and its Freddie Mac stock.

67. Charter Federal's Application for Conversion, Volume III, Exhibit 8(h), Letter to Bank Board from Charter Federal's counsel, at 4. By July of 1989, Freddie Mac stock was trading at $75 per share, creating an unrealized gain of $55 million. As of July 1990, Freddie Mac stock was trading at $81.50 per share, creating an unrealized gain of $61.5 million.

## B. *Proposed Conversion*

On December 27, 1988, Charter Federal's board of directors applied for permission to convert Charter Federal from a mutual association owned by its members to a stock association owned by shareholders.[68] The directors planned for Charter Federal to undergo a voluntary conversion in accordance with the Bank Board's regulations.[69] Under the conversion plan, Charter Federal would issue, in a private offering, 90,000 shares of common stock with a par value of one dollar per share.[70] These shares were only to be offered to certain persons involved with Charter Federal ("the insiders").[71] The aggregate price the insiders were to pay Charter Federal for their shares was $4.5 million,[72] or $50 per share.

In its conversion application, Charter Federal explained that it had been advised that neither a standard nor modified conversion would be feasible because public investors would not be interested in a public offering of Charter Federal stock.[73] Charter Federal thought that its proposed voluntary conversion would comply with the Bank Board's regulations. Relying on the opinion of its accountant, Charter Fed-

eral claimed to be GAAP insolvent.[74] The application also explained that after the voluntary conversion, Charter Federal would be a "viable entity" as required by the Bank Board.[75] Charter Federal would have the proper net worth to total liabilities ratio,[76] and the conversion would be in the best interests of Charter Federal, its members and the FSLIC.[77]

The filing of Charter Federal's conversion application began a six-month dialogue between Charter Federal and the Bank Board. During this time, the Bank Board dispatched several letters to Charter Federal expressing the Bank Board's concerns about the propriety of the proposed conversion. The Bank Board questioned whether Charter Federal truly was insolvent, whether the proposed conversion would be in the best interests of all involved, and whether the insiders' notices of change-in-control should be approved. The Bank Board repeatedly opined that the Freddie Mac stock owned by Charter Federal made Charter Federal much more valuable than the conversion application led one to believe. The Bank Board expressed concern that the insiders would profit immensely from the proposed conversion by receiving the value of the Freddie Mac stock, while

**68.** Conversion Application of Charter Federal, Volume III, Exhibit 8(h), Letter to Bank Board from Charter Federal's counsel dated 12/27/88, at 1.

**69.** *Id.*

**70.** *Id.* at 4.

**71.** Conversion Application of Charter Federal, Volume III, Appendix, Plan of Conversion, Exhibit E. This group of 13 insiders is comprised of officers, directors, employees, and family members of directors of Charter Federal. The members of the group and their relationship to Charter Federal is as follows: John W. Johnson, Jr.—president and chairman of the board of directors; John W. Johnson, III—son of John W. Johnson, Jr.; Martha Birdsong Jones—director and corporate secretary; Joe Hunt Wooley—vice president and comptroller; Bobby Lee Williams—vice president; William Burwell Hudson—director; William Cary Gladden—director; Terrell Edward Bishop—director, executive vice president, treasurer, managing officer; Floyd Hulon Mann—director; Jane Webb Darden—director; Richard Terry Taunton—director; Curti Morel Johnson—son of John W. Johnson, Jr.; and Robert Lee Johnson—di-

rector, vice president, chief financial officer. *Id.*

**72.** *Id.* at 6.

**73.** Conversion Application of Charter Federal, Volume III, Exhibit 8(h), Letter to Bank Board from Charter Federal's counsel dated 12/27/88, at 12, 13.

**74.** *Id.* at 5.

**75.** *Id.* at 7–19.

**76.** *Id.* at 7–8.

**77.** *Id.* at 8–19. Charter Federal claimed that its voluntary conversion would be in the best interests of those involved because: remaining a mutual institution would prevent Charter Federal from obtaining new capital to strengthen its weak financial position; raising capital by selling its Freddie Mac stock would limit the amount of capital Charter Federal could obtain; the interests of Charter Federal's depositors would be protected by the creation of a liquidation account; and the savings and loan system would benefit from the infusion of additional capital. *Id.*

Charter Federal and its members would not. The Bank Board also was troubled about several of the insiders, wondering if they had the necessary financial capabilities and integrity to control Charter Federal.

Charter Federal attempted to allay the Bank Board's concerns by providing more information about the conversion, the insiders, and the resulting stock association, and by modifying its conversion plan. By June 30, 1989, the date of Charter Federal's fifth and final amendment to its application for voluntary conversion, Charter Federal's conversion plan had undergone several major changes, all of which revolved around the conversion shares. Instead of selling 90,000 shares of conversion stock, the amended plan of conversion called for the sale of 150,000 shares. These shares were to be offered at a purchase price of $50 per share, creating the potential for a capital infusion into Charter Federal of $7.5 million. The conversion plan, in its final form, did not limit the purchase of these shares to the insiders; Charter Federal's members would now be allowed to purchase common stock in the converted association. The insiders of the corporation [78] would be entitled to purchase 35% of the total conversion stock offered, i.e., 52,500 shares. John W. Johnson, Jr., president and chairman of Charter Federal's board of directors, and his son, Robert L. Johnson, director, vice president, and chief financial officer of Charter Federal, would each purchase 9.9% of the total conversion stock offered. In other words, they would each purchase 14,850 shares, at a cost of $742,500. Floyd H. Mann, R. Terry Taunton, Terrell E. Bishop, Jane W. Darden, William C. Gladden and William B. Hudson, would each purchase 2.5% of the total offering, i.e., 3,750 shares, for $187,-

500. Martha B. Jones and Bonnie Bonner each would purchase less than one percent of the conversion stock: Martha B. Jones would buy 200 shares for a cost of $10,000, and Bonnie Bonner would buy 100 shares, costing $5,000.

According to the final plan, Charter Federal's members would be able to subscribe for up to 65% of the total shares offered, i.e., 97,500 shares. No individual member, however, could purchase more than 7,500 shares, or 5% of the total offering. Moreover, each member wishing to participate in the offering had to buy at least 10 shares, for an aggregate price of $500.00. The purchase price had to be received in cash, and the offering was only to remain open for 20 calendar days.

If the amount of shares allotted for purchase by the members was oversubscribed, the number of shares each member would be eligible to purchase would be reduced on a pro rata basis. If the Charter Federal members did not subscribe for their full allotment of shares, Bonnie Bonner, an officer of Charter Federal, would be allowed to purchase 500 more shares. If unpurchased shares still remained, a Charter Federal employee stock ownership plan would be permitted to purchase up to 7,500 shares. The right to purchase any shares still unsold would be divided among the insiders.[79]

In enacting its amendments, Charter Federal was obviously aware of the Bank Board's concern regarding the true value of the Freddie Mac stock. As discussed above, Charter Federal changed the conversion plan to allow members, not just insiders, to purchase conversion stock. Charter Federal also pledged that unrealized gains on the price of the Freddie Mac stock as of the actual date of conversion would not be

---

**78.** Throughout its amendment process, Charter Federal changed the members of the group of insiders. *See supra* note 71. This group of insiders no longer includes Joe Hunt Wooley, vice president and comptroller of Charter Federal, or Bobby Lee Williams, vice president of Charter Federal. Instead of purchasing shares of Charter Federal in the initial conversion offering, they would be permitted to purchase shares in a later resale transaction.

**79.** The rights to purchase the remaining shares would be divided as follows: John W. Johnson, Jr. and Robert L. Johnson—28.29% each; Floyd H. Mann, R. Terry Taunton, Terrell E. Bishop, Jane W. Darden, William C. Gladden, and William B. Hudson—7.14% each; and Martha B. Jones and Bonnie Bonner—0.29% each.

included as income of Charter Federal for the purpose of calculating dividends.

Charter Federal's attempts to appease the Bank Board's concerns about the propriety of the proposed voluntary conversion were not successful. On August 5, 1989, the Bank Board issued a resolution, and a notice that this resolution was the Bank Board's final action in the matter, denying Charter Federal's application for voluntary conversion and disapproving the notices of change-in-control filed by the insiders along with the application.[80] The Bank Board found that Charter Federal, upon liquidation, would have net realizable equity; the conversion was not in the best interests of and presented the potential for injury to Charter Federal, its members and the FSLIC; Charter Federal and its management intentionally kept Charter Federal insolvent; and the financial condition and integrity of the insiders was such that their acquisition of control might jeopardize Charter Federal's stability and was not in the best interest of the association. The Bank Board resolved, therefore, that the proposed voluntary conversion of Charter Federal and the notices of change-in-control did not meet the qualification standards set forth in its regulations.

On September 11, 1989, Charter Federal and the insiders filed a petition for review in this court, asking us to review the Bank Board's denial of the conversion application and its disapproval of the change-in-control notices filed by the insiders.[81]

## III. DISCUSSION

### A. *Bank Board's Denial of Charter Federal's Conversion Application*

#### 1. Jurisdiction

■ Title 12 of the United States Code, section 1725(j)(2) (1989), states that "any aggrieved person may obtain review of a final action of the Federal Home Loan Bank Board ... which ... disapproves a plan of conversion ... by complying with the provisions of subsection (k) of section 1730a of this title...." Section 1730a(k) provides:

> Any party aggrieved by an order ... may obtain a review of such order by filing in the court of appeals of the United States for the circuit in which the principal office of such party is located, ... within thirty days after the date of service of such order, a written petition praying that the order ... be modified, terminated, or set aside.... Upon the filing of such petition, such court shall have jurisdiction, which upon the filing of the record [by the Bank Board] shall be exclusive, to affirm, modify, terminate or set aside, in whole or in part, the order....

The Bank Board's denial of Charter Federal's conversion application was a "final action," [82] and Charter Federal complied with the requirements of 12 U.S.C. § 1730a(k). The Eleventh Circuit Court of Appeals is the circuit in which Charter Federal's principal office is located. The Bank Board's order denying Charter Federal's conversion application was published in the Federal Register on August 11, 1989, and Charter Federal filed its petition for review within thirty days of publication, on September 11, 1989. Therefore, we have jurisdiction to review the Bank Board's denial of Charter Federal's application.

#### 2. Standard of Review

■ Our review of the Bank Board's final decision to deny Charter Federal's conversion application is governed by the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.*[83] The Administrative Procedure Act requires that the reviewing court "hold

---

**80.** FHLBB Res. 89–2215 (Aug. 3, 1989).

**81.** The insiders have never requested an administrative hearing on this latter issue. *See supra* note 35.

**82.** *See* Bank Board Res. No. 89–2215 (Aug. 3, 1989), accompanied by Bank Board Notice of Final Action No. AC–776 (dated Aug. 3, 1989).

**83.** The statutes allowing for review of the Bank Board's final decisions also provide the applicable standard of review: "Review of such proceedings shall be had as provided in chapter 7 of Title 5 [i.e., the Administrative Procedure Act]." 12 U.S.C. § 1730a(k) (1989).

unlawful and set aside agency action, findings, and conclusions found to be—arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). "This deferential standard presumes the validity of the agency action" and limits the reviewing court to a determination of "whether the agency has 'considered the relevant factors and articulated a rational connection between the facts found and the choices made.'" *Manasota—88, Inc. v. Thomas*, 799 F.2d 687, 691 (11th Cir.1986) (quoting *Baltimore Gas & Electric Co. v. Natural Resources Defense Council, Inc.*, 462 U.S. 87, 105, 103 S.Ct. 2246, 2256, 76 L.Ed.2d 437 (1983)). This standard reinforces the integral role the Bank Board plays in the conversion process.

### 3. Propriety of Bank Board Decision

By regulation, the Bank Board has determined that no voluntary conversion application will be approved unless, at a minimum, the converting association is insolvent under GAAP and the Bank Board is convinced that the proposed conversion is in the best interests of and does not present the potential for injury to the converting association, its members or the FSLIC. After examining Charter Federal's conversion application, the amendments to its conversion plan, and all of the supporting documents, the Bank Board concluded that Charter Federal did not meet either of these eligibility requirements. Consequently, the Bank Board denied Charter Federal's conversion application.

### a. *GAAP Insolvency*

■ Although the Bank Board concedes that Charter Federal is technically GAAP insolvent, the Bank Board determined that Charter Federal did not meet the voluntary conversion insolvency criterion.[84] The Bank Board found Charter Federal's technical GAAP insolvency to be artificial, not

an accurate reflection of Charter Federal's net worth, and purposely maintained by the insiders to qualify for a voluntary conversion.[85] After examining the true value of Charter Federal's Freddie Mac stock, the Bank Board concluded that upon liquidation Charter Federal would have significant realizable net equity.[86] Accordingly, the Bank Board decided that it was appropriate to consider unrealized Freddie Mac stock gains when determining whether Charter Federal was insolvent.[87] Due to these unrealized gains, the Bank Board found that Charter Federal was not insolvent for voluntary conversion purposes.[88]

Charter Federal claims to be GAAP insolvent in accordance with the voluntary conversion eligibility requirement, and turns to the language of the Bank Board's regulations for support. These regulations provide that a converting association is GAAP insolvent when its "liabilities exceed its assets, as calculated under generally accepted accounting principles on a going concern basis...." 12 C.F.R. § 563b.24(a) (1989).

We agree with Charter Federal that it does meet the voluntary conversion requirement of GAAP insolvency. According to the plain meaning of the words of the Bank Board-drafted regulation, Charter Federal is GAAP insolvent. The regulation does not require insolvency on a liquidation basis; it refers to a going concern basis. Neither does the regulation mention any situations in which departure from GAAP for insolvency determinations would be appropriate. Charter Federal's liabilities do exceed its assets, calculated according to GAAP on a going concern basis. Therefore, we set aside the Bank Board's finding of Charter Federal's solvency because "[t]he failure of an agency to comply with its own regulations constitutes arbitrary and capricious conduct." *Simmons v. Block*, 782 F.2d 1545, 1550 (11th Cir.1986). In making this determination, we do not

---

84. Executive Summary and Memorandum to Bank Board from Bank Board Office of General Counsel, Aug. 2, 1989, adopted by Bank Board in Res. No. 89–2215 (Aug. 3, 1989), at 3.

85. *Id.*

86. *Id.*

87. *Id.*

88. *Id.* at 3, n. 1.

consider whether the drafters intended to exclude artificially maintained GAAP insolvency because "where the language selected by the drafters is clear and unequivocal, the courts are bound to give effect to the plain meaning of the chosen words and no duty of interpretation arises." *KCMC, Inc. v. FCC*, 600 F.2d 546, 549 (5th Cir. 1979).[89]

### b. Best Interests

■ Although GAAP insolvent, Charter Federal may not undergo a voluntary conversion unless it persuades the Bank Board that its proposed conversion "transaction taken as a whole is in the best interests of and does not present the potential for injury to, the converting institution, its depositors and the FSLIC." 12 C.F.R. § 563b.26(b)(3) (1989). The Bank Board has determined that Charter Federal's proposed conversion does not meet this standard. This determination is based on three Bank Board findings: 1) the proposed conversion would not infuse appropriate capital into Charter Federal; 2) the conversion insiders would reap tremendous windfall profits; and 3) the proposed conversion plan discourages Charter Federal members from becoming shareholders in the converted association. After a thorough examination of the administrative record and for the reasons discussed below, we agree with the Bank Board, and hold that the Bank Board acted within its discretion in concluding that the proposed conversion would not be in the best interests of and does present the potential for injury to Charter Federal, its members and the FSLIC.

Charter Federal's final plan of conversion provided for the sale of 150,000 shares of common stock in the converted association, at a price of $50 per share, for an aggregate price of $7.5 million. This $7.5 million figure was not based on an appraisal of Charter Federal's market value.

Charter Federal has unrealized gains, resulting from the market value of its Freddie Mac stock, of more than $50 million, which are not reflected in this $7.5 million price. Therefore, Charter Federal would be selling more than $50 million of assets for only $7.5 million. This transaction would obviously not be in the best interests of the association, its members or the FSLIC, but only in the best interests of those who purchased large amounts of Charter Federal stock, i.e., the insiders.

The Bank Board believes that a standard conversion, rather than the proposed voluntary conversion, would infuse a great deal more than $7.5 million into Charter Federal.[90] The aggregate price of conversion stock in a standard conversion reflects the actual value of the converting association, based on an independent appraisal, and would, therefore, take into account the market value of Charter Federal's Freddie Mac stock. This greater infusion of capital would clearly benefit Charter Federal, its members and the FSLIC.

Charter Federal claims that it was advised by investment banking firms that a standard conversion would not be a viable option. However, as pointed out by the Bank Board, this investment firm analysis was conducted long before the filing of the final amendment to the conversion plan, and does not reflect the later appreciation of Freddie Mac stock.[91] The Bank Board also expressed its belief that a standard conversion would be feasible for Charter Federal.[92] On this issue, we respectfully defer to the Bank Board's judgment, and suggest to Charter Federal that a standard conversion, under the guidance of the Bank Board, might be appropriate. A properly conducted standard conversion would ensure that Charter Federal receives full value for its stock, and would preclude the insider windfall profits that were the Bank

89. In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent all pre-October 1, 1981 decisions of the Fifth Circuit.

90. Bank Board Memorandum from Principal Supervisory Agent to Office of General Counsel,

July 17, 1989, adopted by Bank Board in Res. No. 89–2215 (Aug. 3, 1989), at 13.

91. *Id.* at 12–13.

92. *Id.* at 13.

Board's second major concern with Charter Federal's proposed conversion.[93]

Charter Federal's plan of conversion, as finally amended, provides for distribution of the converted association's shares. Under the plan, the insiders are entitled to at least 35% of the shares, and are not subject to the 7,500 shares (5% of the total offered) per person limit imposed on the members. As stated above, Charter Federal has an intrinsic value of more than $50 million, which will be purchased, according to this plan, for only $7.5 million. Therefore, the insiders will be entitled to at least 35% of this tremendous gain, and, in light of the fact that the plan discourages member participation, as will be discussed *infra*, probably a great deal more. There appears to be no reason why the insiders are entitled to purchase so many of the association's shares and to receive such a large windfall, especially since Charter Federal, not the insiders, has been paying all of the costs associated with the proposed conversion.[94] Through this plan of conversion, the insiders have guaranteed themselves the right to a tremendous windfall.

The insiders claim that they do not intend to strip Charter Federal of its assets, namely the true value of the Freddie Mac stock. However, the insiders collectively are to purchase at least 52,500 shares, at a cost of $2,625,000.[95] To pay for their shares, each insider has arranged for a bank to finance 100% of his or her share purchase. The insiders will be paying for their shares with *borrowed* money, putting up *no* money of their own. After examining the financial statements submitted by the insiders, we agree with the Bank Board that these insiders probably could not afford to repay or even carry this debt unless they received

substantial dividends or other such payments from Charter Federal. This places a tremendous burden on Charter Federal, and could weaken its financial condition to the detriment of Charter Federal, its members and the FSLIC. Again, the insiders alone would benefit.

Charter Federal's initial plan of conversion provided that the insiders were to be the sole purchasers of Charter Federal stock. After this was negatively reviewed by the Bank Board, Charter Federal amended its plan to allow its members to purchase up to 65% of the shares. However, no member would be allowed to purchase more than 7500 shares, i.e., 5% of the total offering, and many restrictions were placed on member subscriptions. Each member had to subscribe for a minimum of 10 shares, for an aggregate purchase price of $500, which had to be paid in cash. No provisions were made to allow members to withdraw this money from their accounts at Charter Federal without incurring early withdrawal penalties. The offer was only to be open for 20 calendar days, during which time members had to read the offering circular, assimilate its information, accurately complete and return the subscription agreement, and come up with at least $500 cash.[96]

These conditions illustrate that not only did the conversion plan place a limit on the amount of shares for which any one member could subscribe, but it also attempted to limit the total amount of member purchases. The reason for this is obvious: if the members of Charter Federal did not subscribe for their full allotment of 65% of Charter Federal shares, the remaining shares would be available for the insiders to purchase. This would, of course, in-

**93.** Charter Federal also claims that a standard conversion would not be feasible because Charter Federal is GAAP insolvent. However, as pointed out by the Bank Board, this GAAP insolvency is a technicality and could be remedied. Bank Board Memorandum from Principal Supervisory Agent to Office of General Counsel, July 17, 1989, adopted by the Bank Board in Res. No. 89–2215 (Aug. 3, 1989), at 9, 13.

**94.** As of June 12, 1989, the conversion expenses paid by Charter Federal totalled $469,596, an

amount considered excessive by the Bank Board. *Id.* at 11. As of February 8, 1990, these conversion costs totalled $835,057. Proxy Statement issued by Charter Federal for special meeting to be held February 8 and 9, 1990 at 25.

**95.** *See supra,* 1578 for an individual breakdown of insider share purchases and costs.

**96.** Checks would be accepted as long as they cleared the bank accounts on which they were drawn within the twenty calendar days.

crease the insiders' windfall profits as well as their control over Charter Federal.

It is evident why the Bank Board concluded that Charter Federal's proposed voluntary conversion would not be in the best interests of and does present the potential for injury to Charter Federal, its members and the FSLIC.[97] If the Bank Board had approved the voluntary conversion, Charter Federal would have received only $7.5 million in exchange for assets worth more than $50 million, and faced the likely post-conversion depletion of its assets. Charter Federal's members would not have received their fair share of the profits from the proposed conversion and the likely sale of Freddie Mac stock. The risk that Charter Federal would be in need of the FSLIC's assistance would also be increased.

All conversions are within the discretion of the Bank Board, and

the Bank Board [has] comprehensive authority over the conversions of federally-chartered insured savings and loan associations to the end that such transactions are accomplished in such a manner that protects the federal interest and those of the association, its depositors, investors and borrowers, and prevents any individual or group from obtaining a windfall. . . .

*Craft v. Florida Federal Savings & Loan Ass'n,* 786 F.2d 1546, 1551 (11th Cir.1986). Because voluntary conversions are allowed to take place without the approval of the converting association's members, the Bank Board places them under even greater scrutiny to protect against insider windfalls. In this case, the Bank Board used this authority wisely and protected the welfare of Charter Federal, its members and the FSLIC. Particularly in light of the recent history of the thrift industry, the Bank Board's exercise of discretion appears sound.

### B. *Bank Board's Disapproval of Insider Change in Control Notices*

A voluntary conversion application is not complete unless it contains the change-in-control notices required by the Bank Board's voluntary conversion regulations.[98] Therefore, in its voluntary conversion application, Charter Federal included change-in-control notices for several of the insiders. The Bank Board disapproved these notices, finding that "[t]he financial condition and integrity of the Acquirors [sic] is such that the proposed acquisition might jeopardize the financial stability of the Association and is not in the best interest of the Association, its depositors, the public, and the FSLIC". Bank Board Res. No. 89–2215 (Aug. 3, 1989). The insiders ask us to review the Bank Board's decision to disapprove change-in-control notices for all of the insiders.

Because the Bank Board did not approve Charter Federal's voluntary conversion application, no voluntary conversion will take place. Charter Federal will remain a mutual association, and there will be no change in its control. Therefore, the issue of whether the insiders qualify to acquire control of an association is moot. Accordingly, we decline to address this issue.

AFFIRMED.

---

97. Charter Federal claims that this "best interests" standard is too vague. However, there is nothing vague about insiders trying to take control of an association in order to reap tremendous windfall profits. Under the circumstances of this case, the standard is remarkably clear. These middle Georgians seem to have ignored the southern adage that "even a pig doesn't get its throat cut until it gets to be a hog."

98. 12 C.F.R. § 563b.27(e) (1989). This regulation specifies that the change-in-control notice must comply with the Bank Board regulations appearing in 12 C.F.R. § 574.3 (1989).