**John W. JOHNSON, Jr.,
et al., Petitioners,**

v.

**OFFICE OF THRIFT SUPERVISION,
UNITED STATES DEPARTMENT OF
THE TREASURY, Respondent.**

No. 95–1203.

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 6, 1996.

Decided April 12, 1996.

Reuben B. Robertson, III, Washington, DC, argued the cause for petitioners, with whom Larry M. Berkow, was on the brief.

Aaron B. Kahn, Principal Litigation Counsel, Office of Thrift Supervision, argued the cause for respondent, with whom Thomas J. Segal, Deputy Chief Counsel, was on the brief.

Before: EDWARDS, Chief Judge, WALD and TATEL, Circuit Judges.

Opinion for the Court filed by Chief Judge EDWARDS.

HARRY T. EDWARDS, Chief Judge:

Petitioners are three directors of Charter Federal Savings & Loan Association ("Charter"). In 1988, Charter applied to the Federal Home Loan Bank Board ("Bank Board")—the predecessor agency of the Office of Thrift Supervision ("OTS")—for permission to convert from "mutual" ownership to "stock" ownership. The Bank Board denied Charter's application, finding, *inter alia*, that the proposed conversion would not be in the best interests of Charter and its account holders. Petitioners, and Charter's other directors, decided to appeal the Bank Board's decision in the United States Court of Appeals for the Eleventh Circuit, and to pursue other avenues of recourse to reverse the Bank Board's decision. Ultimately, the Eleventh Circuit upheld the agency decision, and all other attempts at reversal failed.

Thereafter, the Acting Director of OTS instituted an enforcement action against peti-

tioners.[1] The Acting Director found that petitioners' attempts to reverse the Bank Board's denial of Charter's conversion application—attempts that Charter paid for, but that, according to OTS, benefitted petitioners and other insiders, but not Charter or its depositors—constituted an unsafe and unsound banking practice, a breach of fiduciary duty, and a violation of an agency regulation. The Acting Director issued a cease-and-desist order against petitioners, and ordered them to pay restitution to Charter for expenses incurred in attempting to reverse the Bank Board's decision. On the record at hand, we can find no reasonable evidentiary basis justifying the action taken by the Acting Director against petitioners. Accordingly, we grant the petition for review, vacate the agency's enforcement order, and remand for further consideration.

## I. BACKGROUND

### A. *Charter's Conversion Application to the Bank Board*

Charter is a mutual savings association insured by the Federal Savings and Loan Insurance Corporation ("FSLIC"). At all relevant times, petitioner John Johnson, Jr. was the Chairman of the Board of Directors, President, and General Counsel of Charter; petitioner Robert Johnson (John Johnson's son) was Vice President and a director; and petitioner R. Terry Taunton was a director.

In early 1988, Charter was considering converting from a mutual to a stock institution. At that time, three procedures existed by which such a conversion could be effectuated: a *standard conversion*, a *modified conversion*, and a *voluntary supervisory conversion* ("VSC"). In each case, the mutual association was required to obtain approval from the Bank Board by filing an application for permission to convert.[2]

For present purposes, there are certain important distinctions between the requirements for a standard conversion and those

---

1. Charter's other directors apparently settled with OTS to avoid enforcement action against them.

2. See *Charter Federal Savings and Loan Ass'n v. OTS*, 912 F.2d 1569, 1572–76 (11th Cir.1990), for a discussion of the three forms of conversion and the Bank Board's role in screening applications for mutual-to-stock conversions.

for a VSC, which are the only two forms of conversion at issue in this case. The regulations governing standard conversions aimed to protect the interests of the account holders in at least three ways: account holders were given preferential participation in purchasing the association's newly-issued stock; the converting association was required to sell its newly-issued capital stock at an aggregate price equal to the association's estimated *pro forma* market value as determined by an independent valuation; and, for a converting institution of Charter's size, the officers and directors, as a group, were not permitted to acquire more than 35% of the newly-issued stock. *See* 12 C.F.R. § 563b.3(c)(1)–(2), (8) (1989).

A VSC, by contrast, was designed to infuse capital into a failing institution and was therefore based on the premise that the institution had no real worth. Accordingly, the regulations did not require that the offering price for the institution be based on an appraisal. Moreover, there was no requirement that account holders be offered any of the stock sold in a VSC, *id.* § 563b.21, and the regulations placed no limit on an individual or group purchasing all of the stock.[3] The regulations also required that any proposed VSC transaction, taken as a whole, be in the best interests of (and not present the potential for injury to) the converting institution, its depositors, and the FSLIC. *Id.* § 563b.26(b)(3). Also, in order for an FSLIC-insured institution to qualify for a VSC, the institution's liabilities had to exceed its assets under Generally Accepted Accounting Principles ("GAAP") on a going concern basis. *Id.* § 563b.24(a). Finally, a Bank Board regulation specifically limited the association's expenditure of funds in pursuit of a VSC to a "reasonable" amount. *Id.* § 563b.31.

In early 1988, Charter hired the law firm of Huggins and Associates to provide advice and representation in connection with a proposed VSC of Charter. On July 12, 1988, Stanley Huggins, as outside counsel for Charter, sent a letter to the Bank Board stating that Charter wished to undergo a VSC, and proposing that the institution be purchased by John Johnson and other insiders, along with several individuals associated with the insiders.

Charter's counsel claimed that Charter was eligible for a VSC because the association was insolvent under GAAP, which require all stock to be carried as an asset at its book or acquisition cost. However, Charter at that time held substantial amounts of stock in the Federal Home Loan Mortgage Corporation ("FHLMC" or "Freddie Mac"), stock that had a liquidation value millions of dollars in excess of its acquisition cost. Thus, if its Freddie Mac stock holdings had been liquidated, Charter no longer would have been insolvent on a GAAP basis.

On August 2, 1988, the Bank Board notified Charter that it did not qualify for a VSC because: (1) the institution was not actually insolvent; and (2) taken as a whole, the conversion would not be in the best interests of Charter's deposit account holders. Further, the Bank Board took the position that, because Charter's Freddie Mac stock had an unrealized market value of several million dollars, and because a VSC would deprive the account holders of their interest in the association, a VSC of Charter would be inequitable.

Thereafter, John Johnson retained Ronald Snider of the law firm Miller, Hamilton, Snider & Odom ("the Miller firm") to provide advice as to whether Charter should continue to pursue a VSC. The Miller firm advised Charter that it believed the Bank Board's position was incorrect. On September 15, 1988, petitioners and Charter's other directors authorized Snider to pursue a VSC and to file a formal VSC application on Charter's behalf; the application was filed on December 28, 1988.

The plan presented in Charter's application called for petitioners and other insiders to purchase all of Charter's newly-issued stock for a total purchase price of $4.5 million. At that time, Charter had a negative GAAP net worth of approximately $300,000,

---

**3.** If an individual or group were to seek to purchase a controlling interest, however, change-in-control notices were required to be filed and approved by the agency in addition to the conversion application. *See* 12 C.F.R. § 563b.27(e) (1989).

but held roughly one million shares of Freddie Mac stock with a cost basis of about $20 per share and a market value of about $48 per share. Thus, Charter's Freddie Mac stock holdings represented some $28 million worth of unrealized gain.

After the application for the proposed VSC was filed, a six-month dialogue began between the Bank Board and the insiders. The Bank Board issued three comment letters to Charter expressing concerns about the propriety of the proposed VSC, especially given the value of the institution in light of the unrealized gains in its Freddie Mac stock holdings. In response to the Bank Board's concerns, Charter filed five separate amendments to its VSC application.

Ultimately, pursuant to the amended conversion plan, Charter proposed to raise the offering price to $7.5 million, and, although the VSC regulations did not so require, Charter proposed to open the offering up to all of Charter's depositors. Under the amended plan, 35% of the stock would be offered to the directors, and 65% would be offered to the other depositors.[4] In particular, John and Robert Johnson each could have purchased at least 9.9% of Charter's stock under the revised plan, and Taunton could have purchased at least 2.5%. By the time Charter filed its final amendment on June 30, 1989, and the matter was presented to the Bank Board for decision, the unrealized gain in Charter's Freddie Mac stock had increased to approximately $50 million.

On August 3, 1989, the Bank Board rejected Charter's VSC application, finding that:

1) The Association, upon liquidation, would have net realizable equity;

2) The transaction, taken as a whole, is not in the best interests of, and presents the potential for injury to, the Association, its accountholders, and the FSLIC;

3) The Association and its management have intentionally placed the Association in a position to qualify for the proposed transaction so that the Board

is unable to issue a tax certification in connection with the proposed transaction; and

4) The financial condition and integrity of the Acquirors is such that the proposed acquisition might jeopardize the financial stability of the Association and is not in the best interest of the Association, its depositors, the public, and the FSLIC. . . .

Appendix to Briefs ("App.") 705–06.

B. *Charter's Post–Denial Activities*

On August 24, 1989, the Miller firm provided John Johnson with a memorandum analyzing the Bank Board's decision. The memorandum concluded that, as to each of the four bases relied upon by the Bank Board in denying Charter's proposed VSC, Charter "successfully may be able to argue that the [Bank Board's decision] . . . is arbitrary and capricious." App. 735. Nevertheless, although the Miller firm found it "evident that strong arguments can be made in favor of the proposition that the [Bank Board's] denial of [Charter's] application was inappropriate," the firm opined that, in light of the strict standard of review, "it is unlikely that [Charter] will be able to obtain any judicial relief." App. 740–41. On August 30, 1989, Ronald Snider wrote to John Johnson, reiterating the Miller firm's recommendation that Charter not seek judicial review of the Bank Board's decision, but, rather, recommending that Charter seek reconsideration from the Bank Board itself and propose a compromise position that would address some of the Board's concerns. Letter from Ronald A. Snider to John W. Johnson, Jr. 3–4 (Aug. 30, 1989), *reprinted in* App. 742, 744–45.

On September 4, 1989, Charter's directors held a special meeting of the board to discuss options in light of the denial of the proposed VSC. Petitioners and Charter's other directors were provided with and reviewed a copy of the August 24 memo from the Miller firm. Charter's board then resolved that

---

4. However, individual depositor purchases of the newly-issued stock were to be constrained in several respects; and in the event that the depositors did not purchase all of the shares that

would initially be offered to them, the insiders could increase the number of shares they purchased. *See Charter*, 912 F.2d at 1582.

John Johnson be delegated authority as Charter's general counsel to determine whether an appeal should be pursued. For his part, Johnson concluded that Charter should seek judicial relief, and, on September 11, 1989, Johnson filed a petition for review in the Eleventh Circuit. On the same day, Charter's outside counsel filed a request for reconsideration with OTS, which OTS later denied.

In October and November 1989, Johnson conferred with C.C. Torbert, Jr., a former Chief Justice of the Alabama Supreme Court, about handling the appeal. Johnson also approached the firm of King & Spalding. Both Judge Torbert and the representatives of King & Spalding expressed the view that, based on Johnson's description of the situation and a limited review of the record, they thought the VSC proposed by Charter should have been approved by the Bank Board. *See* OTS Hearing Transcript at 774, 976, 1079, *reprinted in* App. 338, 403, 452. Although both firms expressed a willingness to handle the case if Johnson decided to proceed, neither Torbert nor the King & Spalding attorneys offered an unqualified prediction that Charter would prevail upon appeal. Torbert testified that he thought Charter had a strong case before the Bank Board, but did not commit himself to Charter's chances of success on appeal. *Id.* at 1079, *reprinted in* App. 452. King & Spalding stated that it felt Charter had a good case for appeal, but that assessment was based only on the information it had reviewed, which by John Johnson's admission was "fairly limited." *Id.* at 773–74, 976, *reprinted in* App. 337–38, 403. In any event, Charter's directors balked at King & Spalding's estimate that it would cost between $100,000 and $200,000 for the firm to fully review the case, and probably another $50,000 to argue it on appeal. *See id.* at 976, *reprinted in* App. 403.

King & Spalding ultimately recommended that Charter attempt to persuade the Miller firm to handle the appeal, in light of that firm's familiarity with the case. *Id.* Despite Snider's initial efforts to dissuade Johnson from appealing the Bank Board's denial of Charter's VSC application, the Miller firm eventually agreed to handle the petition for review in the Eleventh Circuit. Charter's directors, as individual petitioners and on behalf of Charter, filed their brief on December 26, 1989.

There is evidence that, during the pendency of the petition for review, Charter considered, but rejected as infeasible, the option of pursuing a standard conversion instead of a VSC. It appears that John Johnson believed at the time that an appraisal for standard conversion purposes would have dictated an offering price commensurate with the liquidation value of Charter's Freddie Mac stock holdings, but that Charter would not be able to raise sufficient investment funds to complete the conversion at such an offering price. In a memorandum documenting a telephone conversation with OTS staff in October 1989, John Johnson noted that he informed OTS staff that:

> [a]t this time, ... a standard conversion simply did not conform, was not practical for our situation. I then ran through the scenario where if we had an appraisal the appraisal would be at least some $35 to $40 million. We would have to raise another $35 to $40 million and that was just completely out of the question in this area. We might get $6 to $8 million at the most, but certainly nothing like $35 to $40 million....

Notes of Telephone Conversation Between John W. Johnson, Jr. and Jerry Comizio at 2 (Oct. 17, 1989) (hereinafter "Telephone Notes"), *reprinted in* App. 777, 778. In addition, there is evidence that Charter was counseled by a financial investment firm that, at least as of late 1988, a standard conversion would not be practicable for Charter, even though the institution met the legal requirements for undergoing such a conversion.[5]

---

5. *See, e.g.,* Letter from Minor Perkins, First Vice President, Corporate Finance, Morgan Keegan & Co., to Charter's Board of Directors 1, 3 (Dec. 23, 1988) (Having been retained by Charter "to render [an] opinion as to the feasibility of a standard conversion," the investment firm of Morgan Keegan & Co. advised that such a conversion "would have a low probability of successful completion."), *reprinted in* App. 582, 584; *see also* OTS Hearing Transcript at 398–99, 404, *reprinted in* App. 207–09 (Ronald Snider of the Miller firm testified that, after consulting with

On February 8 and 9, 1990, Charter held a vote of its member depositors and account holders on issues regarding the VSC. The proxy statement read, in part, as follows:

> Charter Federal is requesting that its members vote on two issues at the Special Meeting: (1) to direct the Board of Directors regarding whether Charter Federal should continue to pursue the [VSC] which it first undertook approximately 18 months ago, and (2) to approve the expenses incurred by Charter Federal to date in the pursuit of the Conversion.

Proxy Statement for Special Meeting of Depositors and Accountholders at 2, *reprinted in* App. 795, 796. At the meeting, John Johnson and other insiders recommended that the members vote to continue the effort to convert and also to approve the payment of the expenses incurred in the conversion effort. In addressing Charter's members, John Johnson suggested that the proposed VSC would better serve the members' interests than would a standard conversion; in part, Johnson based this view on his continued belief that an appraisal for standard conversion purposes would have dictated an offering price on par with the unrealized gain in Charter's Freddie Mac stock, an offering price Johnson thought it unrealistic to pursue. *See* Transcript of Special Members Meeting, *reprinted in* App. 873, 880. When the depositor vote was tabulated on May 25, 1990, approximately 97% of the votes were cast in favor of approving pursuit of the VSC as well as Charter's payment of expenses incurred therewith.

On October 2, 1990, the Eleventh Circuit upheld the Bank Board's denial of Charter's conversion application. *See Charter Fed. Sav. and Loan Ass'n v. OTS*, 912 F.2d 1569 (11th Cir.1990). The court concluded that Charter had satisfied the VSC requirement of GAAP insolvency, and set aside as arbitrary and capricious the Bank Board's finding that Charter was actually solvent for purposes of the VSC requirement as a result of the unrealized gains in Charter's Freddie Mac stock holdings. *Id.* at 1580. However, the court went on to find that the Bank

Board properly denied Charter's VSC application, because the proposed conversion "would obviously not be in the best interests of the association, its members or the FSLIC, but only in the best interests of those who purchased large amounts of Charter Federal stock, i.e., the insiders." *Id.* at 1581.

Substantially all of the costs of the Eleventh Circuit appeal and the unsuccessful attempt to obtain reconsideration by OTS were borne by Charter. It appears that Charter incurred over $250,000 in conversion-related expenses after the denial of the VSC application.

### C. *The OTS Enforcement Action*

OTS instituted an enforcement action against petitioners on June 18, 1993, charging that petitioners and others associated with them had improperly caused Charter to pursue, and bear the costs of, petitioners' efforts to overturn the Bank Board's denial of the VSC application. OTS alleged that petitioners stood to gain large financial benefit at Charter's expense if the conversion application had been approved.

In January 1994, a six-day hearing was held before an Administrative Law Judge ("ALJ"), and on September 15, 1994, the ALJ issued a decision recommending that the OTS charges against petitioners be upheld.

On March 16, 1995, the Acting Director of OTS entered his decision upholding the ALJ's determination that petitioners' actions constituted unsafe and unsound banking practices, breached their duty of loyalty, and violated the expense regulation limiting the expenditure of funds in pursuit of a VSC to a "reasonable" amount. Office of Thrift Supervision, Decision of Acting Director *in re* John W. Johnson, Jr., Case No. AP 93–53 at 1 (1995) ("Enforcement Decision"), *reprinted in* App. 1, 4. The Acting Director further found that petitioners were unjustly enriched by their receipt of a benefit in the form of legal services provided at Charter's expense, and the Acting Director affirmed the ALJ's

---

the investment firm of Morgan Keegan & Co., he concluded that Charter "didn't qualify for the

modified [conversion] and ... couldn't do a standard, so voluntary was the only vehicle.").

conclusion that petitioners had acted in reckless disregard for the law. *Id.* at 36–37, *reprinted in* App. 39–40.

Based on the conclusions cited, the Acting Director ordered petitioners to "cease and desist from engaging in any acts, omissions, or practices involving unsafe or unsound practices, and of violations of law or regulations." Office of Thrift Supervision, Order of Acting Director *in re* John W. Johnson, Jr., OTS Order No. AP 95–17 at 2 (1995) ("Enforcement Order"), *reprinted in* App. 45, 46.[6] The Acting Director also ordered petitioners to make restitution to Charter for their share of the expenses Charter incurred in continuing to pursue the proposed VSC after the application was denied by the Bank Board. *Id.*[7] Petitioners thereafter filed for review in this court.

## II. ANALYSIS

■ Under the Administrative Procedure Act, 5 U.S.C. § 706(2) (1994), decisions of OTS to issue cease-and-desist orders are upheld unless the Director has made an error of law or has made findings that are arbitrary, capricious, or not supported by substantial evidence on the whole record, *see Seidman v. OTS,* 37 F.3d 911, 924 (3d Cir. 1994). In reviewing the agency's decision, a court must consider any evidence that "fairly detracts" from the agency's findings and conclusions. *See Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 464–65, 95 L.Ed. 456 (1951). And in evaluating the evidence underlying an agency finding, we look to see whether there is " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Seidman,* 37 F.3d at 924 (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 216–17, 83 L.Ed. 126 (1938)). On the record at hand, we find that the Acting Director's enforcement decision is unsupported by substantial evidence.

### A. The Acting Director's Finding of Unsafe and Unsound Practices

■ In concluding that petitioners engaged in unsafe and unsound banking practices[8] in their pursuit of reconsideration and reversal of the Bank Board's denial of the proposed VSC, the Acting Director reasoned that petitioners acted contrary to generally accepted standards of prudent operation, because petitioners did not receive "an informed opinion that there was a reasonable prospect of success on appeal" *and* petitioners did not have evidence that a VSC was superior to other forms of conversion (from the perspective of the institution and its depositors). Enforcement Decision at 25–26, *reprinted in* App. 28–29. The Acting Director made clear that petitioners would have prevailed had they shown *either* that they were acting pursuant to "an informed opinion" *or* that a VSC was superior to the other forms of conversion. *Id.*

As to the first factor, the Acting Director found that the record contains no evidence that petitioners had "some factual basis to believe ... that [their] efforts would lead to a reversal of the Bank Board's decision." *Id.* at 27, *reprinted in* App. 30. However, the Acting Director reached this conclusion without taking into account John and Robert Johnson's *unrefuted* testimony that the firm

---

**6.** Under 12 U.S.C. § 1818(b)(1) (1994), OTS may issue a cease-and-desist order if an institution-affiliated party has engaged in proscribed conduct, including: engaging in an unsafe or unsound practice in conducting the business of the association; or violating a law, rule, or regulation. OTS may require the institution-affiliated party to cease and desist from the violation or practice and to take affirmative action to correct the conditions resulting from the violation or practice. 12 U.S.C. § 1818(b)(1) (1994).

**7.** Under 12 U.S.C. § 1818(b)(6)(A) (1994), OTS may order an institution-affiliated party to make restitution or provide reimbursement if either of two conditions are met: (1) a party acts in reckless disregard for the law, applicable regulation, or agency order; or (2) the party has been unjustly enriched.

**8.** The Acting Director adopted a two-part definition of "unsafe or unsound practice":

[A]ny action, or lack of action, [1] which is contrary to generally accepted standards of prudent operation, [2] the possible consequences of which, if continued, would be abnormal risk of loss or damage to an institution, its shareholders, or the agencies administering the insurance fund.

Enforcement Decision at 22 (internal quotation and citation omitted), *reprinted in* App. 25; *accord Seidman,* 37 F.3d at 926.

of King & Spalding opined that petitioners had a "good" and "winnable" case for appeal. OTS Hearing Transcript at 774, 976, *reprinted in* App. 338, 403.

To be sure, King & Spalding based its view on a "fairly limited" review of materials and on Johnson's one-hour-plus oral summary of the situation. *Id.* at 774, *reprinted in* App. 338. However, the Acting Director cites no authority for the proposition that it violates "generally accepted standards of prudent operation" for directors to rely on a second, contrary legal opinion simply because the first opinion was based on a more thorough review of the record. There is no suggestion that petitioners withheld key information from King & Spalding; rather, they sent King & Spalding the materials the firm requested to review. *Id.* at 773, *reprinted in* App. 337. Given that King & Spalding clearly believed that its review of the relevant information was sufficient to venture an opinion, it simply cannot be the law that petitioners were required to expend an additional $100,000 to $200,000 for King & Spalding to review the matter further before petitioners could rely on the firm's opinion. *See id.* at 774, 976, *reprinted in* App. 338, 403.[9] Indeed, it might have been *imprudent* for them to follow this course. This is especially so in light of the fact that petitioners already had received *unanimous* legal advice—including from the Miller firm—that the Bank Board's denial of the proposed VSC was inappropriate and *should* be reversed, even though the Miller firm was pessimistic that the denial would, in fact, likely be reversed.

In any event, the Acting Director never even mentions the testimony regarding King

& Spalding's opinion, much less explains why King & Spalding's opinion was not sufficiently "informed" to satisfy "generally accepted standards of prudent operation."[10] The Acting Director's finding of an unsafe and unsound practice cannot stand in light of the agency's apparent failure even to consider such relevant evidence. *See Tenneco Gas v. FERC,* 969 F.2d 1187, 1214 (D.C.Cir.1992) (per curiam) (The court observed that an agency's failure "adequately to consider relevant evidence.... falls afoul of our requirement that an agency engage in reasoned decision-making by supporting its conclusions with substantial evidence in the record," and, therefore, an agency "order neglectful of pertinent facts on the record must crumble for want of substantial evidence." (internal quotation omitted)).

If anything, the record clearly supports petitioners, not the Acting Director, on the first factor at issue. And if this be the case, then, as the Acting Director's decision makes clear, petitioners must prevail in their defense against the charge of unsafe and unsound practices.

As to the second factor underlying the Acting Director's finding of an unsafe and unsound practice, the Acting Director found that

[t]here is no record evidence that the directors considered why a [VSC] remained the preferred form of conversion from the institution's point of view. To the contrary, the record indicates that [petitioners] were aware of information that indicated that the institution was worth approximately $35 to $40 million, but

---

9. Although Johnson was certainly not required to hire King & Spalding to engage in a full review of the record, his reliance on King & Spalding's opinion had to take the limited basis for their assessment into account. We do not rule here on whether King & Spalding's opinion was sufficient to protect Johnson against charges of unsafe and unsound practices, but leave that question for OTS to address on remand.

10. Similarly, although the Acting Director purports to justify the cease-and-desist order (and the restitution order) in part on the ground that petitioners engaged in an unsafe and unsound banking practice by pursuing "other post-denial activities" besides the Eleventh Circuit appeal (*i.e.*, seeking reconsideration from the Bank

Board itself), Enforcement Decision at 25, *reprinted in* App. 28, the Acting Director fails to address record evidence showing that petitioners were expressly advised to pursue reconsideration. *See, e.g.,* Letter from Ronald A. Snider to John W. Johnson, Jr. 3 (Aug. 30, 1989) (The Miller firm specifically recommended that Charter seek reconsideration in an attempt to "turn[ ] [the Bank Board's] decision around."), *reprinted in* App. 742, 744; Telephone Notes at 1 (OTS staff suggested that, if Charter had another plan to propose, it should have its outside counsel send it to OTS, which would "be glad to consider it in consideration of an application for reconsideration."), *reprinted in* App. 777.

would be offered for $7.5 million in the [proposed VSC].

Enforcement Decision at 26, *reprinted in* App. 29. The implication of the Acting Director's reasoning appears to be that a standard conversion would have produced a sale in the neighborhood of $35 to $40 million, *i.e.*, the alleged *liquidation value* of the institution, rather than the $7.5 million being proposed by petitioners in the VSC application. The suggestion, when scrutinized, is nothing more than an assumption based on nothing.

Petitioners contend, and the Government does not dispute the point, that a standard conversion offering price would have been based on an appraisal of Charter as a "going concern," but such an appraisal would not necessarily have indicated a market value equal to the liquidation value of Charter's assets.[11] Rather, Charter's value as a going concern would have been determined on the basis of the discounted value of Charter's projected future earnings. Thus, although Charter's Freddie Mac stock holdings would have been an important factor in the valuation, it cannot be assumed that an appraisal of Charter for standard conversion purposes would have dictated an offering price equal to the alleged liquidation value of the institution, as represented by the "unrealized gain" in Charter's Freddie Mac stock. Indeed, the Acting Director's decision does not even purport to theorize in these terms.

The Acting Director's best support for his conclusion regarding the offering price that would have resulted from a standard conversion of Charter seems to be the memorandum from October 1989 documenting a telephone conversation between John Johnson and OTS staff, in which Johnson apparently assumed that "if we had an appraisal the appraisal would be at least some $35 to $40 million." *Id.* at 14, *reprinted in* App. 17 (quoting Telephone Notes at 2, *reprinted in* App. 778). However, petitioners forthrightly contend that the statements by John Johnson from which the Acting Director derives the

"$35 to $40 million" figure are simply incorrect.

In any event, even if John Johnson were deemed to have been improperly motivated because he believed that the converted institution actually would be worth some $35 to $40 million but could be bought for $7.5 million under the proposed VSC, the Acting Director cites no evidence in the record establishing that either of the other two petitioners shared John Johnson's belief. To the contrary, Robert Johnson specifically testified that he did *not* expect that Charter's stock would be worth "anything like" $30 million or more after conversion; rather, his own projected-earnings analysis led Robert Johnson to believe that Charter was worth between $5 and $8 million. OTS Hearing Transcript at 980–82, *reprinted in* App. 405–07.

The Acting Director's reliance on John Johnson's statements is nonsensical, for it proves almost nothing (other than that Johnson made a stupid assumption about appraised value). The only real evidence proffered regarding a going-concern valuation of Charter suggests that the $7.5 million price proposed by petitioners in their VSC application was not out of keeping with the price that Charter would have sold for under a standard conversion. Petitioners sought to introduce the analysis of their thrift industry valuation expert, Donald Kaplan, who concluded that the appraised value of Charter for conversion purposes would have been in the range of $4 to $6 million during the relevant period. Brief for Petitioners at 19. OTS objected to the admission of Kaplan's valuation testimony before the ALJ, and the ALJ sustained OTS's objection. The Acting Director seems to concede that Kaplan's analysis was improperly excluded by the ALJ. *See* Enforcement Decision at 27 n. 19 & 29 n. 21, *reprinted in* App. 30 & 32.

Additionally, as noted above, Robert Johnson periodically ran estimates of Charter's worth based on projected earnings, and his analysis put Charter's market value in the

---

**11.** *See* Brief for Petitioners at 16–18. Petitioners point out that OTS's own conversion regulations and appraisal guidelines, *see, e.g.*, 12 C.F.R. § 563b.7(f)(1)(iii) (1989), as well as industry cus-

tom, establish that a valuation of Charter for conversion purposes would have been based on the institution's value as a going concern.

range of $5 to $8 million. OTS Hearing Transcript at 980–82, *reprinted in* App. 405–07. Given the record evidence suggesting that Charter's appraised value would not have been significantly in excess of $7.5 million, and given OTS's failure to conduct a proper valuation of Charter as a going concern, we find that there is no sound evidentiary support for the Acting Director's conclusion that a standard conversion would have resulted in an offering price in the $35 to $40 million range.

Other than the unsubstantiated suggestion that a standard conversion would have resulted in a higher offering price than that included in petitioners' proposed VSC, the Acting Director provides no further basis for his conclusion that petitioners could not reasonably have believed that a VSC was the preferred form of conversion from Charter's point of view. Moreover, the Acting Director does not address the record evidence showing that petitioners were counseled that a standard conversion, though lawful, was not practically feasible. *See* note 5 *supra.*

The Acting Director's decision says that petitioners would have prevailed on their defense against the unsafe and unsound practices charge if (i) they had shown that they acted pursuant to an informed opinion that there was a reasonable prospect of success on appeal *or* (ii) they had presented evidence that a VSC was superior to other forms of conversion. On the first point, the evidence supporting petitioners was never even considered by the Acting Director. On the second point, the Acting Director's theory is patently devoid of evidentiary support. In short, the Acting Director's decision is unsupported by substantial evidence.

On remand, OTS should conduct a proper valuation of Charter as a going concern. Further, the agency must square its unsafe and unsound practice finding with the record evidence regarding King & Spalding's opinion that Charter's case was a good one for appeal. Finally, the agency must explain why the advice given to Charter regarding the infeasibility of a standard conversion does not establish that petitioners held a reasonable belief that a VSC was the pre-ferred form of conversion from the institution's point of view.

In addition, the Acting Director has not adequately explained the basis for his finding that petitioners engaged in conduct that presented an "abnormal risk or loss or damage to [the] institution," as required under the second prong of the definition for "unsafe or unsound practice." *See* note 8 *supra.* The Acting Director found that the abnormal-risk prong was satisfied *"a fortiori,"* because "[a] loss actually occurred as a result of [petitioners'] imprudent decision" to pursue post-denial relief, *i.e.,* "[e]xpenditures on the appeal came directly out of Charter's capital." Enforcement Decision at 27, *reprinted in* App. 30. However, this perfunctory analysis is at odds with the weight of case law holding that "[t]he 'unsafe or unsound practice' provision . . . refers only to practices that threaten the financial integrity of the association." *Gulf Fed. Sav. and Loan Ass'n v. Federal Home Loan Bank Bd.,* 651 F.2d 259, 267 (5th Cir. 1981), *cert. denied,* 458 U.S. 1121, 102 S.Ct. 3509, 73 L.Ed.2d 1383 (1982); *see also Seidman,* 37 F.3d at 928 (Upon reviewing the legislative history and case law regarding the statutory authorization for cease-and-desist orders, the court concluded that, in order to constitute an "unsafe or unsound practice," an act "must pose an abnormal risk to the financial stability of the banking institution.").

Clearly, the fact that an act results in an "actual loss" does not, by itself, establish that the act posed an abnormal risk to the financial stability or integrity of the institution. The Acting Director alleges that "Charter's earnings position was poor" and that Charter paid for the appeal expenses through the sale of capital, Enforcement Decision at 27, *reprinted in* App. 30, but the Acting Director does not explain how these allegations demonstrate that petitioners' pursuit of post-denial relief threatened Charter's "stability" or "integrity." On remand, the agency can attempt to explain this abnormal-risk determination.

B. *The Acting Director's Breach of Fiduciary Duty Finding*

In addition to the "unsafe or unsound practice" finding, the Acting Director also

purported to rest his enforcement decision on a finding that petitioners breached a fiduciary duty because their pursuit of post-denial relief involved "divided loyalty." Enforcement Decision at 28, *reprinted in* App. 31. The Acting Director's theory seems to be that petitioners' reason for pursuing a VSC rather than a standard conversion was to "maintain control" of Charter for a minimal capital outlay, *id.* at 29, *reprinted in* App. 32, and that their pursuit of a VSC as opposed to a standard conversion was disloyal to Charter because a standard conversion would have produced "a greater benefit for the institution and its depositors," *id.* at 28, *reprinted in* App. 31. The "greater benefit" relied upon by the Acting Director was the assumption that a standard conversion "would have generated a greater capital infusion to Charter." *Id.* at 28–29, *reprinted in* App. 31–32. However, the Acting Director's only support for that assumption is John Johnson's statements that Charter was worth "close to $30 million," *id.* at 28, *reprinted in* App. 31, which, as discussed above, is a specious claim. The Acting Director's finding of disloyalty cannot stand in the absence of sound evidentiary support for the Acting Director's belief that a standard conversion would have generated a greater capital infusion than the proposed VSC, in the form of an offering price significantly in excess of $7.5 million.

■ At oral argument and in its brief, the Government attempted to switch the basis for the breach of fiduciary duty finding to the fact that a standard conversion would have afforded the depositors 100% participation rights versus the 65% participation rights provided under the proposed VSC. But a difference in participation rights was not the basis relied upon by the Acting Director for his finding of disloyalty; the "difference" relied upon by the Acting Director was an assumed disparity in expected capital infusion. The agency cannot now shift the basis of its decision. *See North Carolina Utils. Comm'n v. FERC,* 42 F.3d 659, 663 (D.C.Cir. 1994) ("[T]his court cannot accept appellate counsel's post hoc rationalization of an agency decision. The [agency's] decision 'must be upheld, if at all, on the basis articulated by the agency itself.'" (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 50, 103 S.Ct. 2856, 2870, 77 L.Ed.2d 443 (1983))). In short, the Acting Director's finding of disloyalty is unsupported by substantial evidence and must be set aside.[12] Unless the agency can prevail on the dubious charge that Charter would have generated an offering price significantly in excess of $7.5 million, the breach of fiduciary duty charge fails.

## C. *The Acting Director's Restitution Order*

OTS may order an institution-affiliated party to make restitution or provide reimbursement if either of two conditions are met: (1) a party acts in reckless disregard for the law, applicable regulation, or agency order; or (2) there has been unjust enrichment. *See* note 7 *supra.* The Acting Director found that the facts of this case demonstrated both reckless disregard and unjust enrichment, but the Acting Director expressly based these determinations on his earlier findings of unsafe and unsound practices, breach of fiduciary duty, and violation of an expense regulation.[13] Accordingly, the agen-

---

12. The Acting Director found that a cease-and-desist order was warranted in part because petitioners allegedly had violated the expense provision limiting conversion costs to a "reasonable" amount, 12 C.F.R. § 563b.31 (1989). In this regard, however, the Acting Director expressly relied on his earlier discussions of unsafe and unsound practice and breach of fiduciary duty to show that petitioners "caused Charter to devote part of its capital to activities that had no identifiable benefit for the institution." Enforcement Decision at 30, *reprinted in* App. 33. In light of our conclusion that the Acting Director's findings of unsafe and unsound practice and breach of fiduciary duty must be set aside, we also set aside the agency's finding that petitioners breached the

expense regulation. There is simply no evidentiary support for this charge.

13. The Acting Director reasoned that "[u]njust enrichment occurred because, as a result of the violations of safety and soundness, the duty of loyalty and the expense regulation, [petitioners] received a benefit: free legal services in pursuing an appeal and other post-denial relief that would benefit themselves but not necessarily the institution." Enforcement Decision at 36, *reprinted in* App. 39. Further, the Acting Director found that petitioners' "unsafe and unsound practice and breach of the duty of loyalty (both reflecting disregard of the law) were reckless." *Id.* at 37,

**206**

cy's restitution order must be set aside based on the same infirmities that render the cease-and-desist order unviable.

### III. Conclusion

For the reasons set forth above, the enforcement decision and order of the Acting Director of OTS issued against petitioners is hereby set aside, and the case is remanded for further proceedings consistent with this opinion.

*So ordered.*

---

*reprinted in* App. 40. These summary conclu-   sions are unsupported by substantial evidence.